UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CONSTANTIN LEBADA et al.,
                                                    :
                        Plaintiffs,                         REPORT & RECOMMENDATION
                                                    :
        -v.-                                                14 Civ. 758 (LAK) (GWG)
                                                    :
NEW YORK CITY DEPARTMENT OF
EDUCATION et al.,                                   :
                                                    :
                        Defendants.                 :
--------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiffs brought suit under 42 U.S.C. § 1983 alleging that the New York City

Department of Education ("DOE") and school administrators discriminated against them in the

course of their employment as teachers at the High School for Graphic Communication Arts

("HSGCA") based on their age and also retaliated against two of them for exercising their First

Amendment rights.  The defendants have moved for summary judgment.[1]  For the reasons stated

below, the defendants' motion should be granted.

---

[1] See Notice of Motion, filed June 22, 2015 (Docket # 61); Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, filed June 22, 2015 (Docket # 62) ("D.R.56.1"); Declaration, filed June 23, 2015 (Docket # 63) ("First Anci Decl."); Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed June 23, 2015 (Docket # 64) ("D. Mem."); Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment, filed July 28, 2015 (Docket # 78) ("P. Opp."); Plaintiffs' Rule 56.1 Statement in Opposition, filed July 30, 2015 (Docket # 86) ("P.R.56.1"); Amended Affirmation of Ambrose Wotorson, Jr. in Opposition to Defendants' [sic] Motion for Summary Judgment, filed July 30, 2015 (Docket # 87) ("First Wotorson Aff."); Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, filed Aug. 14, 2015 (Docket # 95) ("D. Repl. Mem."); Reply Declaration, filed Aug. 14, 2015 (Docket # 96) ("Second Anci Decl."); Supplemental Memorandum in Opposition to Motion for Summary Judgment, filed Dec. 9, 2015 (Docket # 99) ("P. Supp"); Supplemental Affirmation of Ambrose Wotorson, Jr. in Opposition to Defendant's [sic] Motion for Summary Judgment, filed Dec. 9, 2015 (Docket # 101) ("Second Wotorson Aff.");  Supplemental Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, filed Dec. 16, 2015 (Docket # 102) ("D. Supp."); Declaration, filed Dec. 16, 2015 (Docket # 103) ("Third Anci Decl.").

I.      PROCEDURAL BACKGROUND

Plaintiffs filed this case on February 2, 2014.  See Docket # 2.  Judge Kaplan referred it to Magistrate Judge Dolinger for general pretrial purposes, as well as dispositive motions requiring a Report and Recommendation.  See Order of Reference to a Magistrate Judge, filed Feb. 13, 2014 (Docket # 3).  On July 8, 2015, Judge Dolinger issued an order requiring that all discovery, both fact and expert, be completed by January 30, 2015.  See Order, filed July 15, 2014 (Docket # 11).

On January 12, 2015, the parties jointly applied for an extension of discovery.  Letter from Joseph Anci, filed Jan. 12, 2015 (Docket # 18).  Following a conference held on January 21, 2015, Judge Dolinger extended the discovery schedule.  See Order, filed Jan. 21, 2015 (Docket # 20) ("January Discovery Order"), at 1.  The new schedule required the parties to complete all discovery by March 31, 2015.  Id.  It also required the parties to serve their discovery requests no later than January 26, 2015, gave the parties 30 days to respond to all discovery requests, and required the parties to submit a joint status report to the court every two weeks.  Id.

The defendants served their initial discovery requests on January 26, 2015, as required by the January Discovery Order.  See Email from Joseph Anci to Ambrose Wotorson, Jr., dated Jan. 26, 2015, appended as Ex. C to Third Anci Decl.  The defendants also made their Rule 26 disclosures at this time.  See id.  In their February 4, 2015, status report, the plaintiffs informed the court that they served their initial discovery demands on January 28, 2015 – two days after the date in the January Discovery Order.  See Letter from Ambrose Wotorson, Jr., filed Feb. 4, 2015 (Docket # 21), at 1.  Judge Dolinger retroactively permitted this late service.  See Memorandum Endorsement on Letter from Ambrose Wotorson, Jr., filed Feb. 5, 2015 (Docket

2

# 22).  In the status report, the plaintiffs requested an extension until February 16, 2015, to serve

their initial disclosures under Rule 26, which Judge Dolinger also granted.  See id.

The defendants timely responded to plaintiffs' January 28 discovery demands.  See

January Discovery Order at 1; see also Email from Joseph Anci to Ambrose Wotorson, Jr., dated

Feb. 27, 2015, appended as Ex. G to Third Anci Decl.  But plaintiffs missed their deadline to

respond to the defendants' discovery demands.  See Letter from Joseph Anci, filed Feb. 28, 2015

(Docket # 26), at 2; January Discovery Order at 1.  They also failed to comply with the February

16 deadline to serve initial disclosures, see Letter from Joseph Anci, filed Feb. 28, 2015 (Docket

# 26), at 2 — a deadline the plaintiffs themselves had requested, see Letter from Ambrose

Wotorson, Jr., filed Feb. 4, 2015 (Docket # 21), at 2.  Despite assuring the defendants that

responses to defendants' discovery demands would arrive by the afternoon of February 28, 2015,

plaintiffs failed to meet this deadline.  See Emails between Ambrose Wotorson, Jr. and Joseph

Anci, dated Feb. 27, 2015, appended as Ex. F to Third Anci Decl.  The defendants requested

court intervention to resolve the dispute.  Letter from Joseph Anci, filed Feb. 28, 2015 (Docket

# 26), at 2.

Judge Dolinger held a conference on March 4, 2015.  See Order, filed Mar. 4, 2015

(Docket # 29) ("March Discovery Order").  In the Order following that conference, Judge

Dolinger required the plaintiffs "to serve their initial disclosures, documents responsive to

defendants' requests for production, and answers to defendants' interrogatories by no later than

close of business on March 5, 2015."  Id. at 1 (emphasis omitted).  Judge Dolinger awarded the

defendants "reasonable expenses and fees related to their pursuit of plaintiffs' discovery

materials."  March Discovery Order at 1.  Finally, Judge Dolinger extended the discovery

deadline from March 31, 2015 to April 28, 2015.  Id. at 2.

3

Shortly after midnight on the day after the court-ordered deadline, plaintiffs provided interrogatory responses.  See Email from Ambrose Wotorson, Jr. to Joseph Anci, dated Mar. 6, 2015, appended as Ex. M to Third Anci Decl.  They did not send any documents identifiable as initial disclosures.  Id.  Not only were the interrogatory responses unsworn, they were unsigned.  See Interrogatory Responses, appended as Ex. 2 to Second Wotorson Aff.

In the meantime, depositions had started as of March 5, 2015.  See, e.g., Deposition of Llermi Gonzalez, appended as Ex. F to First Anci Decl.  On March 9, 2015, defendants informed the court of various deficiencies in the March 6 submissions, including the failure to provide initial disclosures, the failure to provide signed interrogatory answers, the failure to provide any answers at all from one of the plaintiffs, and the failure to respond to document requests properly.  Letter from Joseph Anci, filed Mar. 9, 2015 (Docket # 33), at 2.  The defendants wrote to plaintiffs' counsel stating that plaintiffs' continued noncompliance with their discovery obligations prejudiced the defendants' ability to effectively depose witnesses.  See Emails between Joseph Anci and Ambrose Wotorson, Jr., dated Mar. 12, 2015, appended as Ex. P to Third Anci Decl., at 1.  Plaintiffs' counsel responded that he "reasonably expect[ed]" to produce "some" documents on March 12 and 13, and would correct the deficiencies in the interrogatories and document production by March 16, 2015.  Id.  Plaintiffs' counsel also stated that he expected to serve "an [a]utomatic disclosure form" — presumably referring to Rule 26(a)(1) disclosures — by March 16, 2015.  Id.  Notwithstanding these promises, neither Rule 26(a)(1) disclosures nor signed interrogatories were timely provided.  See D. Supp. at 5.

On March 19, 2015, plaintiffs' counsel wrote to the court asserting that plaintiffs would "amend, supplement and provide written discovery responses by March 20, 2015."  Letter from Ambrose Wotorson, Jr., filed Mar. 19, 2015 (Docket # 36), at 1.  This did not occur, however.

4

D. Supp. at 5.  On March 20, 2015, plaintiffs' counsel asked Judge Dolinger for permission to

serve additional discovery demands by April 3, 2015, with responses to be served by April 30,

2015.  Letter from Ambrose Wotorson, Jr., filed Mar. 20, 2015 (Docket # 37), at 2.  Judge

Dolinger denied this request.  See Memorandum Endorsement, filed Mar. 20, 2015 (Docket

# 38), at 2 ("We decline to extend discovery further for any other purpose; therefore, the parties'

request for additional paper discovery extending beyond March 31, 2015 is denied.").

On March 23, 2015, Judge Dolinger granted defendants' application for $2,887.50 in fees

and required "plaintiffs and their counsel" to make the payment no later than April 6, 2015.

Order, filed Mar. 23, 2015 (Docket # 40), at 1.  The payment was not made by the court-ordered

deadline.  D. Supp. at 5.

All of the plaintiffs and individual defendants were deposed in March and April 2015.[2]

On May 26, 2015, defendants again emailed plaintiffs' counsel about plaintiffs' failure to

provide discovery and failure to pay the discovery sanctions.  See Email from Joseph Anci to

Ambrose Wotorson, Jr., dated May 26, 2015, appended as Ex. S to Third Anci Decl.  These

topics were raised at a conference on June 9, 2015, at which time plaintiffs sought permission to

make a motion for sanctions.  D. Supp. at 6.

_____

[2] See Deposition of Jacob Kott, appended as Ex. B to First Anci Decl. (March 16, 2015);
Deposition of Michael Muth, appended as Ex. C to First Anci Decl. (March 17, 2015);
Deposition of Midge Maroni, appended as Ex. D to First Anci Decl. (March 24, 2015);
Deposition of James Peterson, appended as Ex. E to First Anci Decl. (April 6, 2015); Deposition
of Llermi Gonzalez, appended as Ex. F to First Anci Decl. (March 5, 2015); Deposition of
Matthew Guttman, appended as Ex. G to First Anci Decl. (March 6, 2015); Deposition of
Brendon [sic] Lyons, appended as Ex. H to First Anci Decl. (March 10, 2015); Deposition of
Tutti Touray, appended as Ex. I to First Anci Decl. (April 13, 2015); see also Deposition
Excerpts of Brendan Lyons, appended as Ex. 1 to First Wotorson Aff. ("Lyons Deposition
Excerpts"); Deposition Excerpts of Llermy [sic] Gonzalez, appended as Ex. 2 to First Wotorson
Aff. ("Gonzalez Deposition Excerpts").

To date, plaintiffs have still not provided Rule 26(a)(1) disclosures or signed and verified interrogatory answers. Id.[3] It also appears that they have tendered payment of only part of the court-ordered sanctions. See Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint Pursuant to Federal Rules of Civil Procedure 37 and 41, filed June 22, 2015 (Docket # 60), at 6 n. 2; Email from Joseph Anci to Ambrose Wotorson, Jr., dated May 26, 2015, appended as Ex. S to Third Anci Decl.

The defendants filed their motions for summary judgment and for sanctions on June 22, 2015. See Notice of Motion, filed June 22, 2015 (Docket # 61); Notice of Motion, filed June 22, 2015 (Docket # 58).[4] As to the summary judgment motion, the plaintiffs' response was due on July 22, 2015. See Memorandum Endorsement on Letter from Ambrose Wotorson, Jr., filed May 4, 2015 (Docket # 49), at 2. The response was not filed on that date, however. On July 24, 2015, the defendants asked the court to consider the summary judgment motion fully submitted. See Letter from Joseph Anci, filed July 24, 2015 (Docket # 74). On July 27, 2015 — five days after the response was originally due — plaintiffs moved for an extension of time to respond to the summary judgment motion. Letter from Ambrose Wotorson, Jr., filed July 27, 2015 (Docket

---

[3] To dispel any confusion that may arise in a reader poring over the record, the Court notes that a page of an exhibit attached to an affirmation from plaintiffs' counsel contains the words "Kott Initial Disclosures and Discovery Documents." See Ex. 3, appended to Second Wotorson Aff. What follows this page, however, is merely a memorandum authored by a nonparty, Steve Landress — not a disclosure of witnesses by plaintiffs in accordance with Fed. R. Civ. P. 26(a)(1)(A)(i). Indeed, counsel's affirmation refers to this document as "Plaintiffs' Initial Document Production, Landress Memorandum," not as "initial disclosures." See Second Wotorson Aff. at 1.

[4] Apparently due to a computer error, the defendants' memorandum of law and accompanying declaration were not uploaded until 1:36 AM on June 23, 2015. The court deemed these documents timely filed. See Memorandum Endorsement on Letter from Joseph Anci, filed June 23, 2015 (Docket # 66).

# 75).  The court granted that motion "reluctantly," giving the plaintiffs until "close of business" on July 27 to file their opposition.  Memorandum Endorsement on Letter from Ambrose Wotorson, Jr., filed July 27, 2015 (Docket # 76).  Judge Dolinger noted that the plaintiffs had "missed virtually every deadline set by this court throughout this litigation."  Id.

The plaintiffs filed an incomplete opposition on July 28 — six days after the original deadline.  See Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment, filed July 28, 2015 (Docket # 78); Affirmation of Ambrose Wotorson, Jr., in Opposition to Defemdants' [sic] Motion for Summary Judgment, filed July 28, 2015 (Docket # 79).  The affirmation from Ambrose Wotorson, Jr., submitted with the memorandum of law, listed twelve exhibits, none of which were appended to the affirmation filed on ECF.  See Affirmation of Ambrose Wotorson, Jr., in Opposition to Defemdants' [sic] Motion for Summary Judgment, filed July 28, 2015 (Docket # 79).

The defendants again requested that the court consider the motion fully briefed based on this omission and the fact that the plaintiffs' memorandum of law was unsigned.  See Letter from Joseph Anci, filed July 29, 2015 (Docket # 81), at 2.  On July 30, 2015, the plaintiffs filed a new affirmation with exhibits appended.  See First Wotorson Aff.  The version of the Wotorson Affirmation filed on July 30 listed two fewer exhibits than those listed on the affirmation submitted on July 28.  Compare First Wotorson Aff. with Affirmation of Ambrose Wotorson, Jr., in Opposition to Defemdants' [sic] Motion for Summary Judgment, filed July 28, 2015 (Docket # 79).  The new Wotorson Affirmation designated the missing exhibits as "[w]ithdrawn."  First Wotorson Aff. at 1-2.  In a letter, the plaintiffs blamed their delays and incomplete filings on technical issues.  See Letter from Ambrose Wotorson, Jr., filed July 30, 2015 (Docket # 85).

In their reply memorandum, the defendants urged the court to reject the plaintiffs'

7

opposition papers as untimely.  See D. Repl. Mem. at 2.  They also argued that three affidavits appended to the First Wotorson Aff. — those of Lantingua Sime, Anne Barry, and Steve Landress — should be precluded on the grounds that the individuals were never identified in initial disclosures and that therefore the defendants were "denied the opportunity to seek any discovery from, or take the depositions of, these individuals."  Id. at 6.

On November 16, 2015, the case was reassigned from Judge Dolinger to the undersigned. See Docket Entry for Nov. 16, 2015.  The undersigned thereafter issued an order affording the plaintiffs the opportunity to respond to the defendants' argument seeking preclusion of the affidavits of the three witnesses.  See Order, filed Dec. 2, 2015 (Docket # 98).  Both sides filed supplemental papers on this issue.  See P. Supp; Second Wotorson Aff.; D. Supp.; Third Anci Decl.

## II.   DEFENDANTS' REQUEST FOR PRECLUSION

Plaintiffs' response to the summary judgment motion included four sworn statements from plaintiffs and three from other individuals: Sime, an Assistant Principal at a school that is unidentified in the affidavit but is presumably HSGCA, see Affidavit of Lantigua Sime, appended as Ex. 5 to First Wotorson Aff.; Barry, a teacher at HGSCA, see Declaration of Anne Barry, appended as Ex. 6 to First Wotorson Aff.; and Landress, a "union steward" who interviewed candidates for teaching jobs at Digital Minds, see Affidavit of Steve Landress, appended as Ex. 7 to First Wotorson Aff.[5]  Defendants have moved to preclude plaintiffs from using these three affidavits on the ground that they were never disclosed in Rule 26(a) initial disclosures from plaintiffs.  See D. Repl. Mem. at 4.

---

[5] Defendants sometimes refer to this individual as "Steve Childress."  E.g. D. Repl. Mem. at 4.

Fed. R. Civ. P. 26 provides that at the start of the case, parties must disclose

the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]

Fed. R. Civ. P. 26(a)(1)(A)(i).  These disclosures must be supplemented as new information comes to light.  See Fed. R. Civ. P. 26(e)(1).  If a party does not identify a witness in the initial disclosures, that party is "not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "Substantial justification is defined as 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'"  Preuss v. Kolmar Labs., 970 F. Supp. 2d 171, 175 (S.D.N.Y. 2013) (quoting Am. Stock Exch., LLC v. Mopex, Inc., 215 F.R.D. 87, 93 (S.D.N.Y. 2002)).  "Failure to comply with Rule 37(c)(1) is harmless 'when there is no prejudice to the party entitled to the disclosure.'"  Id. (quoting Am. Stock Exch., LLC, 215 F.R.D. at 93).  Even if the nondisclosure is not substantially justified or harmless, a court has discretion to allow the evidence.  See Design Strategy, Inc. v. Davis, 469 F.3d 284, 297-98 (2d Cir. 2006).

Here, the plaintiffs never made any Rule 26(a) disclosures of witnesses at all, notwithstanding repeated orders from the court that they do so.  Rule 37(c)(1) thus provides for preclusion of the three witnesses' affidavits unless the plaintiffs' failure was either "substantially justified or . . . harmless."  The plaintiffs do not contend that their failure to make Rule 26 disclosures was "substantially justified."  Rather, they argue that the witnesses' identities "were specifically disclosed in interrogatory responses and document productions that were forwarded to defendants via email on March 5th and 6th" and that "defendants asked numerous question

[sic] about affiant Sime during Jacob Kott's deposition; defendants heard testimony from Midge Maroni about affiant Anne Barry; and [plaintiff's counsel] asked defendant Brendan Lyons . . . about a statistical Memorandum . . . that affiant Landress wrote." P. Supp. at 2.

To the extent plaintiffs' argument is intended to suggest that the witnesses' names were "disclos[ed]" within the meaning of Rule 26(a)(1) through interrogatory responses, documents or deposition testimony, that argument is rejected. The interrogatory responses, see Second Wotorson Aff., Ex. 2, were never signed — let alone sworn — notwithstanding multiple court orders to provide proper responses. E.g. January Discovery Order, March Discovery Order; see also Fed. R. Civ. P. 33(b)(3), (5). It would thus be unreasonable to expect the defendants to have assumed the interrogatory responses should be viewed as a substitute for Rule 26 disclosures. Similarly, the mere discussion of an individual in documents or deposition testimony is insufficient to create a duty on defendants to assume that such an individual is a witness that plaintiffs "may use to support [their] claims" under Rule 26(a)(1)(A)(i). Plaintiffs have provided no evidence suggesting that it was clear these individuals would be proffered by plaintiffs as witnesses in this case. Because the defendants were entitled to assume that these individuals would not be relied on by plaintiffs as witnesses, they properly refrained from deposing them.

As one court has noted, a party's mere "knowledge of the existence of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if [the disclosing party] informed [the opposing party] that it might call the witness." Pal v. New York Univ., 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008); accord Fleming v. Verizon New York, Inc., 2006 WL 2709766, at *9 (S.D.N.Y. Sept. 22, 2006) (plaintiff disclosed two witnesses' names at her deposition, but "[a]bsent the disclosure of the declarants' identities under Rule 26(a), it would be unreasonable to expect [defendant] to depose them"). As the plain

terms of Rule 26(a) indicate, the point of the rule is to require a party to inform the other side not only that the party believes a witness actually has "discoverable information," but also that the party "may use" information from that witness "to support" its own case at trial. Rule 26(a) thus fulfills a critical function: transmitting formal notice from the disclosing party to the opposing party that the opposing party should be prepared for the disclosing party to use the information provided by the witness. In the absence of such a disclosure, the opposing party can properly assume that its adversary will not rely upon that witness.

Notwithstanding the language in Rule 37 regarding preclusion of undisclosed witnesses, case law makes clear that a district court retains discretion to allow the evidence or impose sanctions. Before precluding evidence because of a party's nondisclosure, courts consider

> (1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (alterations in original) (internal quotation marks omitted) (quoting Softel, Inc. v. Dragon Med. and Sci. Commc'ns, Inc., 118 F.3d 955, 961 (2d Cir. 1997)). In their opposition to defendants' request to preclude, plaintiffs have not argued that the affidavits should be admitted as a matter of discretion and have not addressed any of the case law articulating or applying these factors. See P. Supp. For this reason alone, the affidavits may be properly precluded. Nonetheless, we will consider the factors in Patterson anyway.

The first factor weighs very heavily against the plaintiffs. Plaintiffs nowhere provide an explanation for their conduct in this matter. As already described, the defendants repeatedly reminded plaintiffs of their failure to comply with the requirement to make their initial

11

disclosures.  The court ordered plaintiffs to make these disclosures on at least two occasions.

See January Discovery Order, March Discovery Order.  But plaintiffs simply defied the court's

directives.  Plaintiffs' defiance "suggests a deliberate attempt on [plaintiffs'] part to engage in

the 'sandbagging' that Rule 26 forbids." Agence France Presse v. Morel, 293 F.R.D. 682, 688

(S.D.N.Y. 2013).

Plaintiffs make no argument on the importance of the affidavits. See P. Supp.  This

failure should by itself be sufficient to find that this factor weighs against plaintiffs.  But even if

we assumed that the affidavits were critical to plaintiffs in opposing the summary judgment

motion, it would not help plaintiffs' position.  In general, the greater the importance of a witness,

the more prejudice is suffered by the defendants by not having had the opportunity to depose that

witness, seek documents from him or her, or question other witnesses about the witnesses'

activities or knowledge.  Defendants deposed numerous witnesses without any reason to

investigate Sime, Barry, or Landress because they properly assumed that those witnesses would

not be "used to support [plaintiffs'] claims." Fed. R. Civ. P. 26(a)(1)(A)(i).[6]  Defendants also

missed their chance to take the depositions of any of the witnesses.  Finally, defendants briefed

their summary judgment motion without reference to or knowledge of any of these witnesses'

testimony.  Because plaintiffs rely on these witnesses' testimony to counter defendants' motion

for summary judgment, it is plainly prejudicial to defendants to require them to proceed in this

case when they had no opportunity to conduct discovery relating to these witnesses.

Additionally, case law shows that the mere fact that the evidence may be important is

_____

[6] It is of no moment that the conduct of one or more individuals came up during some
depositions inasmuch as defendants had no idea the individuals might actually be witnesses in
the case.

not sufficient to avoid preclusion where no explanation has been given for the delay.  As one case noted, "[t]o permit entirely unexplained Rule 26 violations to go unsanctioned whenever the evidence at issue is sufficiently important would give parties the perverse incentive to spring especially large and surprising disclosures on their adversaries on the eve of trial."  Agence France Presse, 293 F.R.D. at 687.

Finally, while "a continuance is always a possibility," Pal, 2008 WL 2627614, at *6, granting one here would essentially upend this case.  The summary judgment motion has been fully briefed.  Discovery, which closed many months ago, would now need to be reopened not only to permit depositions of the three witnesses but also potentially to allow questioning of plaintiffs regarding their interactions with these individuals.  Moreover, plaintiffs' continual dilatory conduct strongly counsels against taking this course.  Case law has recognized that where a party has had "ample time to disclose [affiants'] identit[ies]" and provides no explanation for its failure to do so, a continuance is not warranted.  Preuss, 970 F. Supp. 2d at 179 (denying continuance where affiant was disclosed after the close of discovery and no explanation was given for the failure to disclose); accord Haas v. Del. & Hudson Ry. Co., 2007 WL 766324, at *3 (N.D.N.Y. Mar. 8, 2007) (preclusion granted where plaintiff did not disclose witness until filing of response to summary judgment motion and no justification was offered for the delay ), aff'd, 282 Fed. App'x 84 (2d Cir. 2008).  Additionally, the fact that discovery closed many months ago "also weighs strongly against the possibility of a continuance." Spotnana, Inc. v. Am. Talent Agency, Inc., 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010) (four month delay); see also Pal, 2008 WL 2627614, at *6 (unless the nondisclosing party has shown it attempted to comply with its discovery obligations, it "should not be permitted to upset a discovery schedule which was extremely liberal and to which its adversary adhered.").

13

In sum, the three affidavits of the undisclosed witnesses should be precluded.

Accordingly, they will not be considered in adjudicating the summary judgment motion.

III.    FACTUAL BACKGROUND OF PLAINTIFFS' CLAIMS

A.    Facts Based on Plaintiffs' Affidavits and Uncontested Rule 56.1 Statements

The following facts are either undisputed or reflect the plaintiffs' versions of the facts as supported by admissible evidence.  The four plaintiffs remaining in this case are Jacob Kott, Michael Muth, James Peterson, and Midge Maroni.[7]  D.R.56.1 ¶ 1, P.R.56.1 ¶ 1.  The plaintiffs are current and former teachers employed by DOE at HSGCA.  D.R.56.1 ¶ 1, P.R.56.1 ¶ 1.  In addition to the DOE, there are four remaining individual defendants.  D.R.56.1 ¶¶ 20-27, P.R.56.1 ¶¶ 20-27; see also D. Repl. Mem. at 1 n.1.  These are (1) Brendan Lyons, who became principal of HSGCA in September 2011 and was principal during the period at issue, D.R.56.1 ¶ 23, P.R.56.1 ¶ 23; (2) Llermi Gonzalez, who was an assistant principal at HSGCA during the period relevant to this case, D.R.56.1 ¶ 20, P.R.56.1 ¶ 20; (3) Tutti Touray, who was an assistant principal for the 2012-2013 school year, D.R.56.1 ¶ 25, P.R.56.1 ¶ 25; and (4) Matthew Guttman, who was an assistant principal, D.R.56.1 ¶¶ 59-61, P.R.56.1 ¶¶ 59-61.

DOE planned to close HSGCA at the end of the 2011-2012 school year and replace it with the Creative Digital Minds High School ("Digital Minds").  D.R.56.1 ¶ 28, P.R.56.1 ¶ 28.  DOE included HSGCA in the "Turnaround" program, which involved closing schools that fail to attain certain goals set by DOE.  D.R.56.1 ¶¶ 29-32, P.R.56.1 ¶¶ 29-32.  HSGCA "was one of the poorest performing schools in NY State" before Lyons arrived.  D.R.56.1 ¶ 36, P.R.56.1 ¶ 36.

_____

[7] Plaintiff Constantin Lebada is no longer pursuing any claims.  See D. Repl. Mem. at 1 n.1.

DOE determined that "'[a] comprehensive shift [was] needed in the school to raise the quality of teaching and learning for all students in the school.'"  D.R.56.1 ¶ 32, P.R.56.1 ¶ 32.

Lyons was supposed to become the principal of Digital Minds.  D.R.56.1 ¶ 28, P.R.56.1 ¶ 28.  DOE intended for Digital Minds to have significant pedagogical differences from HSGCA, including, inter alia, adherence to the Common Core curriculum and reliance on "active teaching methods instead of teachers leading the work."  D.R.56.1 ¶ 45, P.R.56.1 ¶ 45.  The school was supposed to prepare students for careers in digital media design by "using hands on activities to replicate the typical working practices of Graphics design, marketing and advertising firms," D.R.56.1 ¶¶ 46-47, and helping students "develop the essential skills necessary for successful careers in the digital media design industry," D.R.56.1 ¶ 48; see also P.R.56.1 ¶¶ 46-48.

The "Turnaround" program permitted schools to immediately hire new personnel to improve the school's instructional quality.  D.R.56.1 ¶ 33, P.R.56.1 ¶ 33.  Lyons, together with two DOE representatives and two representatives from the teachers' union, made hiring decisions for Digital Minds.  D.R.56.1 ¶¶ 37-40, P.R.56.1 ¶¶ 37-40.  All HSGCA teachers had the right to apply to work at Digital Minds, and the hiring committee "was obligated to interview current employees of HSGCA."  D.R.56.1 ¶ 41,  P.R.56.1 ¶ 41.  Kott, Muth, and Peterson all declined to apply for positions at Digital Minds; Maroni applied, was interviewed by the hiring committee, and was not offered a position.  D.R.56.1 ¶¶  50-58, P.R.56.1 ¶¶ 50-58.

Digital Minds never held any classes because an Administrative Law Judge ruled that the "Turnaround" process was impermissible.  D.R.56.1 ¶ 49, P.R.56.1 ¶ 49.  Nonetheless, Lyons stayed on as principal at HSGCA, and began to implement some of the pedagogical changes intended for Digital Minds, including having teachers "follow the workshop model of instruction, use technology in the classroom, provide data driven instruction, and use

15

differentiation for students." See D.R.56.1 ¶ 114, P.R.56.1 ¶114.

The "workshop model" involves "teachers providing a mini lesson to students outlining what the teacher wants the students to be able to do." D.R.56.1 ¶ 115, P.R.56.1 ¶ 115. "[F]or the majority of the class period, students demonstrate that they can implement what was taught." Id. "The teacher then assists students to determine if the students learned the lesson." Id. "The workshop model follows the premise that students learn best by doing." D.R.56.1 ¶ 116, P.R.56.1 ¶ 116. "In the workshop model, the teacher outlines the objectives for the lesson in a measurable fashion so that at the end of the lesson the teacher can determine if the students mastered the goals of the lesson." Id. "Lyons wanted to move instruction away from teaching methods such as the read aloud method, where a teacher has students read passages to their peers, as well as away from teacher centered instruction, wherein teachers lectured to the students and did not spend time applying what was learned." D.R.56.1 ¶ 117, P.R.56.1 ¶ 117. Notwithstanding Lyons's focus on the workshop model, all four of the plaintiffs "taught students using traditional lecture methods." D.R.56.1 ¶ 120, P.R.56.1 ¶ 120.

Teachers at HSGCA had access to a number of resources for professional development, including a union center, an administrative period to coordinate within departments, off-campus courses, and courses taught by a third-party company. D.R.56.1 ¶¶ 122-126, P.R.56.1 ¶ 122-126. "[I]t was common practice to have teachers who excelled in a particular area or skill to [sic] demonstrate that skill for other teachers." D.R.56.1 ¶ 126, P.R.56.1 ¶ 126.

Two plaintiffs, Kott and Maroni, received "unsatisfactory" ratings ("U-ratings") after classroom observations in the 2011-2012 school year. D.R.56.1 ¶¶ 59-60, P.R.56.1 ¶¶ 59-60 (Kott); D.R.56.1 ¶ 78, P.R.56.1 ¶ 78 (Maroni). The U-rating appears to prevent teachers from performing "per session (overtime)" work. Declaration of James Peterson in Opposition,

appended as Ex. 11 to First Wotorson Aff. ("Peterson Decl.") ¶ 12.  It also apparently prevents

teachers from teaching summer school, prevents them from transferring between schools, and

affects pension benefits.  Declaration of Midge Maroni in Opposition, appended to First

Wotorson Aff. as Ex. 10 ("Maroni Decl.") ¶ 24.

Guttman, Kott's supervisor, issued Kott's "unsatisfactory" rating.  D.R.56.1 ¶¶ 59-64,

P.R.56.1 ¶¶ 59-64.  Guttman evaluated Kott between forty-five and fifty times over

approximately six to seven years, and only evaluated him as unsatisfactory one time – in 2011-

2012.  D.R.56.1 ¶¶ 62-64, P.R.56.1 ¶¶ 62-64.  Kott was 68 years old at the end of the 2011-2012

school year.  D.R.56.1 ¶ 94; Amended Complaint, appended as Ex. A to First Anci Decl.

("Amended Complaint") ¶ 21(r).  Normally, only two weeks pass between an observation and

the production of a physical report.  See Declaration of Jacob Kott in Opposition, appended to

First Wotorson Aff. as Ex. 9 ("Kott Decl.") at ¶ 8.  Kott's unsatisfactory classroom report was

apparently produced on March 26, 2012, and related to a classroom observation on December

23, 2011.  See Observation Report, appended as Ex. K to First Anci Decl. ("Kott Eval.") at 648,

651.[8]  Kott appealed his rating, but the appeal was denied.  D.R.56.1 ¶ 69, P.R.56.1 ¶ 69.

In February 2012, prior to receiving the classroom observation U-rating, Kott was

removed from his position as the "Work Based Learning Coordinator," which he had held for

five years.  Kott Decl. ¶¶ 4, 10.  The position was offered to two teachers who were "at least 25

years younger than [Kott]."  Id. ¶ 10.  Prior to the date Guttman evaluated Kott, Kott overheard a

conversation between Gonzalez and Assistant Principal Lantigua Sime in which Gonzalez said

that he was "surprised" by Sime's allegations that Lyons was "discriminat[ing]" against older

---

[8] We cite to the Bates-numbered pages of this document.

teachers.  Kott Decl. ¶ 5.

    Between February and March 2012, Kott spoke out against certain of Lyons's policies, such as "encourag[ing] grade inflation . . . [and] re-direct[ing] funds that were earmarked and mandated to be used for existing programs and students."  Id. ¶¶ 11-12.  Kott received his "unsatisfactory" classroom observation rating after he had confronted Lyons about these policies.  Id. ¶ 16.  The unsatisfactory classroom observation rating apparently served as the basis for his year-end "unsatisfactory" rating, which was the first of Kott's career.  Id. ¶ 18.  Lyons told Kott that Kott's U-rating was based on his noncompliance with the workshop model.  Id. ¶ 19.  Kott retired after receiving his U-rating.  Id. ¶ 22.

    Gonzalez supervised Maroni and issued Maroni's "unsatisfactory" ratings.  See Deposition of Midge Maroni, appended as Ex. D to First Anci Decl., at 32; D.R.56.1 ¶ 78, P.R.56.1 ¶ 78.  In 2011-2012, Maroni had been "written up for excessive absences and unprofessional conduct," D.R.56.1 ¶ 87, including a substantiated accusation of unprofessional conduct made by a school aide, D.R.56.1 ¶¶ 88-89, P.R.56.1 ¶¶ 87-89.  At a meeting with Lyons and Steve Landress in December 2011, Maroni "said that Assistant Principal Llermy [sic] Gonzalez had created a hostile, ridicule-filled work environment for [Maroni], in part, by pervasively making age-related comments to [Maroni] by repeatedly referring to [Maroni] and another older teacher, Anne Barry, as 'Mommy.'"  Maroni Decl. ¶ 4; see also id. ¶ 6.  Maroni also complained about being required to learn the workshop model "by observing and copying the newer, younger teachers, one of whom was a first year teacher, who was at least thirty years younger than [Maroni] and was untenured."  Id. ¶ 5.  During 2011-2012, Gonzalez asked Maroni to visit several other teachers' classrooms to observe their implementation of different elements of the workshop model and other teaching techniques.  D.R.56.1 ¶¶ 82-86, P.R.56.1 ¶¶ 82-86.  In

18

December 2011, Gonzalez gave Maroni a "disciplinary action plan" and "admitted to [Maroni] that no other teacher was given such an action plan."  Maroni Decl. ¶ 8.  The plan cited Maroni for failing to follow the workshop model.  Id. ¶ 9.  While Maroni requested additional training on the workshop model, there was no professional development offered on the model "other than Lyon's [sic] 10 minute lecture in front of staff a [sic] the beginning of the 2011-2012 School year."  Id. ¶ 25.  Because Maroni found that lecture "insufficient," she "did not learn the 'Workshop Model of Instruction' from it."  Id.

Lyons placed disciplinary letters in Maroni's file charging her with excessive absences, although Maroni had given Lyons medical documentation for the absences and "had not exceeded the allotted days [off] as per the [teachers'] union contract."  Id. ¶¶ 10-12.  Lyons told Maroni that "'a doctor's note is no excuse.'"  Id. ¶ 13.  In February 2012, Lyons took a laptop and certain other equipment from Maroni's classroom and held it for two months, alleging falsely that she had not "'locked it up.'"  Id. ¶¶ 14, 16. This significantly harmed Maroni's ability to perform her job duties.  See id. ¶¶ 18-20.  Maroni was the only teacher subjected to such treatment.  Id. ¶ 19 ("Lyons did not confiscate any other teacher's laptops.").  When students took a younger teacher's laptop, the administration gave the younger teacher a new one. Id.  Finally, in "early 2012," Maroni complained to Lyons about grade inflation and "illegally re-direct[ing] funds."  Id. ¶ 21-22.  Maroni received her year-end U-rating in June 2012.  Id. ¶ 24. At the time of her U-rating, Maroni was approximately 65 years old.  See D.R.56.1 ¶ 73; see also Amended Complaint ¶ 21(ccc).  Maroni appealed her rating, which was upheld through the grievance process.  D.R.56.1 ¶ 75, P.R.56.1 ¶ 75.  Maroni retired in February 2013.  Maroni Decl. ¶ 27.

The remaining plaintiffs, Muth and Peterson, received "unsatisfactory" ratings from

Lyons at the end of the 2012-2013 school year.  D.R.56.1 ¶¶ 100-101, P.R.56.1 ¶¶ 100-101.

Both had received "satisfactory" ratings from Lyons for the 2011-2012 year.  D.R.56.1 ¶ 71,

P.R.56.1 ¶ 71 (Muth); D.R.56.1 ¶ 90, P.R.56.1 ¶ 90 (Peterson).  Touray supervised both Muth

and Peterson in the 2012-2013 year. D.R.56.1 ¶ 108, P.R.56.1 ¶ 108.  Touray and Lyons gave

Muth unsatisfactory classroom observation ratings in 2012-2013.  D.R.56.1 ¶ 102, P.R.56.1

¶ 102.  Touray also gave Muth a satisfactory classroom observation rating that year.  D.R.56.1 ¶

103, P.R.56.1 ¶ 103.

　　　　Muth's year-end U-rating was the first of his career.  Declaration of Michael Muth in

Opposition, appended as Ex. 12 to First Wotorson Aff. ("Muth Decl.") ¶¶ 2-3.  Muth "had

difficulty following and understanding" the workshop model, id. ¶ 8, in part because there were

no "professional development sessions demonstrating the Workshop Model of Instruction" other

than "a single 10 minute lecture to staff from Lyons, at the beginning of the 2011-2012 school

year," id. ¶ 9.  Touray instructed Muth to "observe new, untenured and considerably younger

teachers" to learn the workshop model.  Id. ¶ 10.  Touray informed Muth that his inability to

comply with the workshop model caused his unsatisfactory classroom observations, which in

turn influenced his year-end U-rating.  Id. ¶¶ 10-12.  At the time of his U-rating, Muth was over

55 years old.  See D.R.56.1 ¶ 112; Amended Complaint ¶ 21(ff).  Muth took a leave of absence

in 2014-2015, and is now responsible for teaching Peterson's classes.  Muth Decl. ¶ 14.

　　　　 Peterson "had difficulty following and understanding" the workshop model despite his

best efforts.  Peterson Decl. ¶ 8.  He began to receive negative evaluations "as a result" of his

difficulties.  Id.  He noted Lyons's "single 10 minute lecture to staff" on the workshop model.

Id. ¶ 9.  Following unsatisfactory classroom observation ratings during the 2012-2013 year,

D.R.56.1 ¶ 104, P.R.56.1 ¶ 104, Peterson received a year-end U-rating.  Peterson Decl. ¶¶ 3, 12.

This was the first such rating he had received in his career.  Id.  Touray had directed Peterson to observe younger, untenured teachers to improve his understanding of the workshop model.  Id. ¶ 10.  Touray informed Peterson that his U-rating was due in part to noncompliance with the workshop model.  Id.  In June 2015, Peterson was charged with "alleged teaching incompetence" and given "notice of an intent to terminate [his] employment."  Id. ¶ 14.  It represents the first time his performance has been deemed "incompetent."  Id. ¶ 15.  At the time of his U-rating, Peterson was 67 years old.  D.R.56.1 ¶ 112; Amended Complaint ¶ 21(pp).

   B.  Paragraphs in Defendants' 56.1 Statement That Were Not Controverted by Plaintiffs

   For the above recitation of the facts, we have relied on a number of admissions made in plaintiffs' counterstatement pursuant to Local Civil Rule 56.1.  See P.R.56.1.  In a number of instances, however, plaintiffs' counterstatement purports to controvert defendants' statement but fails to cite evidence that actually does so.

   In paragraphs 65, 68, 72, 138, 139, 140, and 141 of the defendants' rule 56.1 statement, defendants assert as follows:

   65. Lyons did not tell Guttman to give Kott an unsatisfactory classroom observation rating.

   68. Kott received an end of year U rating for the 2011-2012 school year based on poor pedagogy.

   72.  Maroni received an end of year unsatisfactory rating for the 2011-2012 school year based on poor pedagogy.

   138. Gonzalez, an AP during the 2011-2012 school year, has never heard Lyons state that non-tenured teachers feared for their jobs and were more likely to work hard.

   139. Guttman, an AP during the 2011-2012 and 2012-2013 school years, has never heard Lyons comment that he wanted certain teachers to be rated unsatisfactory.

   140. Lyons testified that he has never stated that tenured teachers were not working hard enough.

141. Lyons testified that he has never expressed an opinion that untenured teachers tended to work harder because they were afraid of losing their jobs.

Each of these paragraphs cites to evidence that supports the paragraph. To controvert these statements, plaintiffs cite only to the Sime affidavit, which has been precluded, and a single page of Gonzalez's deposition. See P.R.56.1 ¶¶ 65, 68, 72, 138-41 (citing Gonzalez Deposition Excerpts at 178). In the cited testimony, Gonzalez states only that he cannot remember if Sime ever told him that Lyons had made discriminatory statements. See Gonzalez Deposition Excerpts at 178. Obviously, this statement does nothing to contradict the statements in the above paragraphs. Consequently, paragraphs 65, 68, 72, 138, 139, 140, and 141 of the defendants' Rule 56.1 statement are deemed admitted.

Paragraphs 127, 128 and 129 of the defendants' Rule 56.1 statement read as follows:

127. Classroom observations were performed to highlight the areas in which a teacher performed well, to identify the areas where a teacher needed support, and support would be provided in the areas that were lacking.

128. End of year ratings were based on classroom observation reports, time and attendance records, disciplinary history, and conversations with the assigned AP to supervise that teacher.

129. No one received a U rating based on their inability to follow the workshop model. Ratings were based on evidence of student learning.

D.R.56.1 ¶¶ 127-29. In each instance, defendants cite to deposition testimony of Touray that supports the paragraph. Apart from the precluded Sime affidavit, plaintiffs cite only to pages 246-48 of the Lyons Deposition Excerpts to controvert these paragraphs. See P.R.56.1 ¶¶ 127-29. On these pages, Lyons described the differences between the workshop model and the more traditional lecture model of teaching. Lyons Deposition Excerpts at 246-48. Lyons also acknowledged that the plaintiffs "typical[ly]" used the traditional style, and that their use of traditional lecture-style teaching was "an impacting factor" in their classroom observations. Id.

at 247.  Lyons's description of the two models of teaching does not controvert ¶ 127, however, which describes the reasons why classroom observations were performed.  It does not controvert ¶ 128 either, because it does not describe how HSGCA administrators arrived at their end-of-year rating.  Consequently, paragraphs 127 and 128 are deemed admitted.

The testimony arguably controverts the assertion that "[n]o one received a U rating based on their inability to follow the workshop model," D.R.56.1 ¶ 129, however, because Lyons stated that the use of traditional lecture-style teaching methods was an "impacting factor" on whether Lyons either gave or approved U-ratings to the plaintiffs, see Lyons Deposition Excerpts at 247.  Thus, depending on how broadly one interpreted the term "based on" in paragraph 129, plaintiffs might be said to have controverted this statement because Lyons testified that the use of the traditional lecture style could contribute to a U-rating, though plaintiffs have pointed to no testimony indicating that it was the sole factor in determining such a rating.[9]

IV.   LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56(a) states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[9]  Paragraph 118 of the defendants' Rule 56.1 statement reads:

The workshop model was present and used in HSGCA before 2011.  In some classes it was very present, in others it was completely absent.

This statement is supported by testimony from Lyons.  See Lyons Deposition Excerpts at 143-45.  The plaintiffs cite to other testimony by Lyons to controvert this paragraph.  See P.R.56.1 ¶ 118.  None of the cited testimony, however, controverts this statement.  Instead, in the cited testimony, Lyons describes the features he planned for Digital Minds, Lyons Deposition Excerpts at 139-42; describes "active teaching" pedagogy and the workshop model, id. at 142; discusses the workshop model's intellectual pedigree, id. at 145-50; describes the staff and physical layout of the HSGCA principal's office, id. at 151-52; details differences between the workshop model and the more traditional lecture model of teaching, id. at 246-48; and discusses the plaintiffs' U- ratings, id. at 252-56.  Thus, paragraph 118 is uncontroverted.

judgment as a matter of law." See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (citation omitted); see also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence.")

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256, and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted). Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (alteration in original) (quoting Celotex, 477 U.S. at 322). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

V.      DISCUSSION OF SUMMARY JUDGMENT ARGUMENTS

A.  Age Discrimination[10]

    1.  Governing Law

Plaintiffs' age discrimination claims are brought under 42 U.S.C. § 1983 alleging

violation of the Equal Protection Clause of the Fourteenth Amendment.  See Amended

Complaint ¶¶ 28-29.  Courts assess § 1983 discrimination claims according to the three-step,

burden shifting framework established by the Supreme Court in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802-05 (1973).  See Sorlucco v. New York City Police Dep't, 888 F.2d 4,

6-7 (2d Cir. 1989); accord Burkhardt v. Lindsay, 811 F. Supp. 2d 632, 651 (E.D.N.Y. 2011)

("Age-based employment discrimination claims brought pursuant to § 1983 are analyzed under

the three-step, burden-shifting framework established by the Supreme Court in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).") (citing Kearney v. Cty. of Rockland ex

rel. Vanderhoef, 185 Fed. App'x 68, 70 (2d Cir. 2006)) (additional citations omitted).

Under the McDonnell Douglas framework, the plaintiff carries the initial burden of

establishing a prima facie case of discrimination in cases alleging that the proffered reason for

the employment action was a mere pretext for discrimination.  McDonnell Douglas, 411 U.S. at

802; accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Joseph v. Leavitt, 465

F.3d 87, 90 (2d Cir. 2006) (quoting James v. N.Y. Racing Ass'n, 233 F.3d 149, 153–54 (2d Cir.

2000)).  To establish a prima facie case of disparate treatment, a plaintiff must demonstrate that:

(1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered

---

[10] As described in Piccone v. Town of Webster, 511 Fed. App'x at 63 n.1 (2d Cir. 2013) (summary order), it is an open question in the Second Circuit whether the Age Discrimination in Employment Act ("ADEA") preempts age discrimination claims under section 1983.  The defendants here have made only a cursory argument on this point.  See D. Mem. at 3.  The plaintiffs do not address it.  It is not necessary to reach the issue, however, as we conclude that the section 1983 claims should be dismissed on the merits.

an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination.  See Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802).

If the plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; see St. Mary's, 509 U.S. at 506–07; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253–55 (1981); Joseph, 465 F.3d at 90; Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP, 491 F. Supp. 2d 386, 395 (S.D.N.Y. 2007), aff'd 323 Fed. App'x 59 (2d Cir. 2009).  If the employer articulates such a reason for its action, the presumption of discrimination is eliminated, and "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  James, 233 F.3d at 154 (citing cases).[11]  Such evidence may include, for example, a showing that "'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  Patterson v. Cty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (quoting Burdine, 450 U.S. at 253).  Importantly, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  St. Mary's, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253) (alteration in original); accord Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).  Thus, it is not sufficient for the

---

[11] A "but-for" causation standard applies to the third McDonnell Douglas step for claims brought under the ADEA, while a lower "mixed-motives" standard applies for section 1983/Title VII claims.  See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009)); Liebowitz v. Cornell Univ., 584 F.3d 487 n.2 (2d Cir. 2009); accord Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 105-07 (2d Cir. 2010).

fact-finder to disbelieve the employer's explanation; rather, "'the fact-finder must believe the plaintiff's explanation of intentional discrimination.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (quoting St. Mary's, 509 U.S. at 519) (emphasis omitted). In other words, the plaintiff "must always prove that the conduct at issue . . . actually constituted discrimination." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (internal quotation marks, emphasis and alteration omitted).

While the plaintiff must prove that the defendant's proffered reasons for its action were pretextual, the plaintiff is not always required to "introduce additional, independent evidence of discrimination." Reeves, 530 U.S. at 149 (citation omitted). "In appropriate circumstances," the evidence of pretext alone will be sufficient to "infer . . . that the employer is dissembling to cover up a discriminatory purpose." Id. at 147 (citation omitted); see also Schnabel, 232 F.3d at 90 (citation omitted) (quoting Reeves, 530 U.S. at 143) ("Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'").

Despite the elaborate framework set up in McDonnell Douglas, Second Circuit case law makes clear that the court may simply assume that the plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action. See, e.g., Graves v. Finch Pruyn & Co., 457 F.3d 181, 187–88 (2d Cir. 2006) (declining to resolve a dispute regarding the establishment of a prima facie case of age discrimination on the ground that plaintiff had "not pointed to any record evidence to dispute [defendant's] legitimate reason . . . for the alleged adverse employment action"); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168

(2d Cir. 2001) (declining to decide whether a <u>prima</u> <u>facie</u> case was made out because defendant "met its burden to put forth legitimate, nondiscriminatory reasons for [plaintiff's] termination, and [plaintiff] has failed as a matter of law to proffer evidence of pretext sufficient to go to a trier of fact."); <u>accord</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 470 (2d Cir. 2001), <u>cert. denied</u>, 534 U.S. 993 (2001); <u>Sattar v. Johnson</u>, 2015 WL 5439064, at *9-10 (S.D.N.Y. Sept. 11, 2015); <u>Morris v. Ales Grp. USA, Inc.</u>, 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007); <u>Tomney v. Int'l Ctr. for the Disabled</u>, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); <u>Mathews v. Huntington</u>, 499 F. Supp. 2d 258, 264 (E.D.N.Y. 2007).  We shall take that route here.

## 2.  Analysis

Plaintiffs' memorandum of law never directly identifies what adverse employment action is the subject of their claims of discrimination.  Plaintiffs talk vaguely about a plan to target plaintiffs for "elimination or forced retirement."  P. Opp. at 12.  But the memorandum of law frequently attacks the implementation of the workshop model itself.  Thus, plaintiffs complain that Lyons "introduc[ed] new, cutting edge pedagogy, which disparately impacted older teachers who were accustomed to teaching in a more traditional style."  <u>Id.</u> at 5.  The concept of the new teaching requirements causing a "disparate impact" is repeated at other points in plaintiffs' brief. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 13 ("this new pedagogy, intentional or not, adversely impacted older teachers who were not yet accustomed it [sic]."); <u>id.</u> at 19 ("this Court may properly find that sending plaintiffs to observe nontenured teachers in order to learn new pedagogical methods is strongly suggestive of the discriminatory impact of the Workshop Model.").

These arguments suffer from two defects.  First, they do not identify what "adverse employment action" is at issue.  To the extent plaintiffs are arguing that being required to learn

28

new teaching methods is itself an "adverse action," we reject this claim. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. . . . To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (interpreting ADEA) (citations and internal punctuation omitted). Plaintiffs have not shown why the new system of teaching was not in the nature of an alteration in job responsibilities.

In any event, to the extent plaintiffs are trying to make a disparate impact claim, any such claim is impermissible. While the ADEA "does authorize recovery in 'disparate-impact' cases," Smith v. City of Jackson, Miss., 544 U.S. 228, 232 (2005), "a plaintiff pursuing a claimed violation of § 1981 or a denial of equal protection under § 1983 must show that the discrimination was intentional," Patterson, 375 F.3d at 226 (citations omitted); accord Reynolds v. Barrett, 685 F.3d 193, 201 (2d Cir. 2012). Thus, plaintiffs cannot prevail merely by showing that it was more difficult for older teachers to learn the "workshop" or "active teaching" method, even if the result of their having such difficulty was that they experienced an adverse employment action.

What remains appear to be plaintiffs' claims that the decision to give them U-ratings was motivated by their age.[12] With this in mind, we turn to inquire whether defendants have offered a legitimate, non-discriminatory reason for the U-ratings. Defendants assert that "[p]laintiffs

---

[12] While Kott and Maroni assert that, notwithstanding their resignations, they were "constructively discharged," see P. Opp. at 2, it appears that, to the extent their resignations were not prompted by retaliation (a topic discussed in the next section), their resignations were prompted by the "stress," see Kott Decl. ¶ 22, Maroni Decl. ¶ 26, that resulted from being given the unsatisfactory ratings and the "harassment" that the U-ratings represented to them, id.

demonstrated poor pedagogy and were ineffective as teachers."  D. Mem. at 8.  The defendants

have put into the record copious documents concerning the plaintiffs' performance, including

reports of classroom observations over the course of many days.[13]  Defendants also point to

Maroni's "disciplinary issues," including "excessive absenteeism" and a substantiated complaint

against her by a co-worker.  D. Mem. at 8; see also Deposition of Brendon [sic] Lyons, appended

as Ex. H to First Anci Decl., at 232-33; Letters from Brendan Lyons to Midge Maroni, appended

as Ex. Q to First Anci Decl.; Letter from Llermi Gonzalez, appended as Ex. S to First Anci Decl.

 Because this evidence is sufficient to meet defendants' burden at the second step of the

McDonnell Douglas analysis, we turn to the third step: whether plaintiffs have pointed to

evidence that would allow a jury to find that these reasons were a pretext and that age

discrimination motivated at least in part the decision to give plaintiffs U-ratings.

 Plaintiffs' evidence on this question is insufficient to allow a reasonable jury to find in

their favor.  To the extent they rely on an unsworn memorandum from Steven Landress, see P.

Opp. at 9-12; Memorandum from Steve Landress, appended as Ex. 8 to First Wotorson Aff., we

reject this evidence as inadmissible hearsay.  What remains, after discounting any arguments

---

[13]  See Kott Eval.; Observation Report, appended as Ex. N to First Anci Decl. ("Maroni Eval."); Observation Report, appended as Ex. V to First Anci Decl.; Observation Report, appended as Ex. DD to First Anci Decl.  Also in the record are the year-end evaluations that show the U-ratings.  See Review and Report on Probationary Service of Pedagogical Employee, appended as Ex. J to First Anci Decl. (Kott's year-end U-rating); Annual Professional Performance Review and Report on Probationary Service of Pedagogical Employee, appended as Ex. L to First Anci Decl. (Muth's 2011-2012 year-end "satisfactory" rating); Annual Professional Performance Review and Report on Probationary Service of Pedagogical Employee, appended as Ex. M to First Anci Decl.  (Maroni's year-end U-rating); Annual Professional Performance Review and Report on Probationary Service of Pedagogical Employee, appended as Ex. U to First Anci Decl.  (Muth's 2012-2013 year-end U-rating); Annual Professional Performance Review and Report on Probationary Service of Pedagogical Employee, appended as Ex. CC to First Anci Decl.  (Peterson's year-end U-rating).

based on the precluded affidavits, are attacks on the workshop model of instruction, P. Opp. at 12-14, and some stray actions that plaintiffs suggest indicate discriminatory intent on the part of the defendants, id. at 17-19.

We begin by noting a critical and dispositive lacuna in plaintiffs' proof: evidence that would allow a reasonable jury to find that the U-rating for each plaintiff was in any way inaccurate or not properly reflective of that plaintiff's performance.  None of the plaintiffs have provided evidence that their U-ratings or any of the classroom observations that led up to them were in any way inconsistent with the criteria the school was using for evaluating teachers. Maroni, Peterson and Muth's affidavits do not even address the question of the accuracy of the U-ratings or the classroom observations, let alone provide evidence that the ratings were inaccurate.  Indeed, Peterson and Muth candidly admit that they had "difficulty following and understanding" the workshop model and that "despite [their] best efforts[,] [they] began to receive negative evaluations as a result."  Peterson Decl. ¶ 8, Muth Decl ¶ 8.  Kott's only evidence on this question is his statement that "there was a contradictory observation and no basis for an overall 'U' rating."  Kott Decl. ¶ 19.  The mere statement that there was "no basis" for the overall rating, however, is conclusory, and thus does not provide evidence that would allow a reasonable jury to find that Kott's U-rating was pretextual.  And, of course, in the cases of Kott and Maroni, it is already established that they "received an end of year U rating for the 2011-2012 school year based on poor pedagogy."  D.R.56.1 ¶¶ 68, 72.  Even apart from this admission, the fact that plaintiffs received U-ratings was seemingly inevitable irrespective of plaintiffs' age, since all four of them admit to using traditional lecture methods, notwithstanding Lyons's focus on the workshop model.  D.R.56.1 ¶ 120, P.R.56.1 ¶ 120.

The plaintiffs' attack on the workshop model itself, P. Opp. at 12-14, provides no basis

for finding that the U-ratings were motivated by age.  Plaintiffs complain that they had to observe younger teachers to learn it, id. at 12-13, and that their ratings were based on their inability to follow it, id. at 13-14.  But there is no evidence that the implementation of the workshop model was itself a pretext for generating U-ratings for older teachers.  Thus, the mere fact that all teachers were expected to adhere to it does not constitute evidence of age discrimination.  As to the allegation that plaintiffs were instructed in the model by younger teachers, the plaintiffs assert, albeit without citation, that "there is . . . no dispute that it is the newer, more recent graduates who are more familiar with the 'Workshop Model of Instruction.'" P. Opp. at 12.  We question whether there is any admissible evidence in the record to support this assertion.  But even assuming arguendo that the assertion was supported by evidence, the mere fact that the school used a model that younger teachers are more familiar with does not allow for an inference of age discrimination.  Plaintiffs admit that "it was common practice to have teachers who excelled in a particular area or skill to [sic] demonstrate that skill for other teachers." D.R.56.1 ¶ 126, P.R.56.1 ¶ 126.  It follows, therefore, that the fact that younger teachers were demonstrating the method to older teachers it is not indicative of age discrimination.  Plaintiffs find it of great significance that their admitted "problems with the [sic] functioning under the work shop model," P. Opp. at 13, were "impacting factor[s]" on their U-ratings, Lyons Deposition Excerpts at 247.  But given that there was nothing improper about requiring the plaintiffs to follow the workshop model, this "impact" does not show that age was a motivating factor in the decision to give them U-ratings.

Plaintiffs supply no admissible comparator evidence at all.  Thus, there is no evidence that any younger teachers who had "problems" with the workshop model or who persisted in using traditional methods of teaching were given "satisfactory" ratings.

The other admissible evidence offered by plaintiffs would not allow a jury to find age discrimination in the U-ratings. Kott relates a conversation he overheard in which Sime allegedly complained about "'discrimination'" against older teachers by Lyons. Kott Decl. ¶ 5. Kott heard Gonzalez reply that he was "'surprised.'" Id. This evidence has almost no evidentiary weight; it does nothing to show that Kott's unsatisfactory classroom ratings were pretextual.

Kott states that in February 2012 he was relieved of his duty as the "Work Based Learning Coordinator" — a job he had held for five years — and the job was offered to two teachers "at least 25 years younger than [Kott]." Id. ¶¶ 4, 10. Kott asserts that "[n]o reason was ever given for [his] removal, though [he] sought an explanation without any success." Id.; see also P. Opp. at 17 (citing this episode as an example of discrimination). There is absolutely no further evidentiary support regarding this claim, however. We are not informed what the requirements were for holding the position, or what the replacement teachers' qualifications were. For all the record reflects, they may have been more qualified than Kott. We also must keep in mind that Kott has admitted that his overall year-end U-rating was based on "poor pedagogy." D.R.56.1 ¶ 68.

Maroni's affidavit describes two episodes she argues demonstrate age discrimination. First, she views Lyons's confiscation of her laptop as being motivated by age discrimination. See Maroni Decl. ¶¶ 16-20. She states that per her "own observation, none of the younger English teachers had their laptops confiscated in the manner in which [Maroni's] was. This was [a] naked attempt to make [Maroni] less productive." Id. ¶ 19. Second, she states that Gonzalez "repeatedly referr[ed] to [her] and another older teacher, Anne Barry, as 'Mommy'" and states that she told Lyons about this. Id. ¶ 4.

33

We do not view either of these matters as sufficient to allow a reasonable jury to find that Maroni's U-rating was motivated by age.  The laptop incident shows only that Lyons singled Maroni out from among HSGCA English teachers, not that he did so because of her age.  See Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001) (rejecting racial discrimination claims under 42 U.S.C. § 1981 where plaintiffs did "little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race.") (citing Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998)).  Maroni supplies evidence only that one younger teacher was given a laptop when it was stolen.  Maroni Decl. ¶ 19.  While she states without elaboration that "none of the younger English teachers had their laptops confiscated in the manner in which [hers] was," id., no further detail is given as to this claim.  We have no evidence of how often this occurred, how teachers of subjects other than English were treated when their laptops were stolen, or how other older teachers were treated when a laptop was stolen.

As to being called "Mommy," the Second Circuit in Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010), cert. denied, 562 U.S. 1279 (2011), provided guidance in deciding the probative value of "stray remarks" for proving discriminatory intent.  Henry lists the following factors:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level coworker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Henry, 616 F.3d at 149 (2d Cir. 2010).  On the first factor, the plaintiffs correctly note that Gonzalez rated Maroni's performance and instructed her to learn the workshop model.  P. Opp. at 18.  Thus, the fact that Gonzalez used the nickname is significant.  Indeed, Gonzalez admitted that the nickname was "unprofessional."  Gonzalez Deposition Excerpts at 133-34.  The

34

nickname is also arguably suggestive of age discrimination, though not strongly so.

Nonetheless, there is nothing to indicate that the nickname was used in relation to the U-rating or

in relation to the decision-making process.  Without such evidence, the nickname was merely

one of the "stupid . . . things" that an employer may do without incurring liability.  Norton, 145

F.3d at 120; see also Sethi v. Narod, 12 F. Supp. 3d 505, 538-42, 548 (E.D.N.Y. 2014) (calling

employee "f—king Indian" not enough to allow inference of discrimination in relation to

employment decision) (citing Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) ("stray

remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a

case of employment discrimination")).  In any event, Maroni has admitted that her year-end U-

rating was based on "poor pedagogy."  D.R.56.1 ¶ 72.

      In sum, the plaintiffs' evidence does not allow a reasonable jury to find that "'the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination.'"  Patterson, 375 F.3d at 221 (quoting Burdine, 450 U.S. at 253).  Put differently,

none of the plaintiffs produce sufficient evidence to allow a reasonable jury to find that age

discrimination "motivated" their U-ratings "at least in part."  Vega, 801 F.3d at 87 (quoting

Stratton v. Dep't for the Aging for City of New York, 132 F.3d 689, 878 (2d Cir. 1997)).

      B.  First Amendment Retaliation

        1.  Governing Law

      Plaintiffs Kott and Maroni bring First Amendment retaliation claims under 42

U.S.C. § 1983.  Amended Complaint ¶ 34.  To establish a prima facie case for such a claim, a

plaintiff

> must establish that: "(1) his speech or conduct was protected by the First
> Amendment; (2) the defendant took an adverse action against him; and (3) there
> was a causal connection between this adverse action and the protected speech."

 Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)).  A "causal connection" may be shown either "indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."  Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004) (citation and internal quotation marks omitted).  Importantly, regardless of whether plaintiff presents direct or indirect evidence of causation, a plaintiff always bears the "initial burden of showing that an improper motive played a substantial part in defendant's action."  Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011) (quoting Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003).  In other words, to demonstrate the causal connection, plaintiff must show that the protected speech was "at least a 'substantial' or 'motivating' factor" in defendants' alleged retaliatory acts.  White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058 (2d Cir. 1993) (citations omitted), cert. denied, 510 U.S. 865 (1993); accord Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (citation omitted) (plaintiff must show that "the protected conduct was a substantial or motivating factor" in the defendants' decision); Pitton v. New York City Dep't of Educ., 2015 WL 7776908, at *9 (E.D.N.Y. Dec. 2, 2015) (same).  Thus, even where temporal proximity might support an inference of causation, "[t]he relevance of temporal proximity in a particular First Amendment retaliation case turns on its unique facts and circumstances."  Lyman v. NYS OASAS, 928 F. Supp. 2d 509, 527 (N.D.N.Y. 2013) (citation omitted).

        Additionally, if the three elements of a prima facie case are made out, the defendant may avoid liability by showing "that it would have taken the same adverse action in the absence of the protected speech."  Anemone, 629 F.3d at 114 (citation and internal quotation marks omitted).

2. <u>Application</u>

Plaintiffs' memorandum of law makes clear that the adverse actions that are the subject of the retaliation claims are Kott and Maroni's "annual 'U' rating." P. Opp. at 24, 25. For the reasons already described, none of the plaintiffs, including Kott and Maroni, have provided evidence that would allow a reasonable jury to find that these U-ratings were motivated by age. For similar reasons, there is a complete lack of evidence that the annual U-ratings for Kott and Maroni were motivated by their speech.

Plaintiffs' brief on this point marshals no evidence to support their contentions regarding Kott's protected speech. <u>See</u> P. Opp. at 23-24.[14] Having examined the record, we note that Kott's affidavit states that he confronted Lyons at least three times "[b]etween February 2012 and early March 2012." Kott Decl. ¶ 12. Kott did not receive his end-of-year U-rating until June 2012, approximately four months after the allegedly protected activity started. <u>Id.</u> ¶ 18.[15]

As for Maroni, she confronted Lyons in "early 2012," Maroni Decl. ¶ 22, and received her year-end unsatisfactory rating in June 2012, Annual Professional Performance Review and Report on Probationary Service of Pedagogical Employee, appended as Ex. M to First Anci Decl. (Maroni's year-end U-rating). Notably, HSGCA administrators produced three written classroom observation reports judging her performance "unsatisfactory" before she ever

---

[14] While plaintiffs cite to Lyons Deposition Excerpts at 36-37, they did not include them in the record and thus they are not before the Court.

[15] The observation report given to Kott is dated March 26, 2012, and indicates that he was observed on December 23, 2011. Kott Eval. at 648, 651. Kott asserts that classroom observation reports were "typically available within two weeks after an observation." <u>Id.</u> ¶ 8. There is no reasonable inference that the report was held over because of his protected speech, however, given that, under Kott's view, the report should have been available in early January, before he even began his protected speech.

37

confronted Lyons.  See Maroni Eval. at 568-72 ("unsatisfactory" observation report written prior

to November 9, 2011), 567 ("unsatisfactory" report produced on December 5, 2011), 562

("unsatisfactory" observation report produced on December 15, 2011).  The defendants had other

reasons for giving Maroni a poor rating beyond classroom performance, including a

substantiated complaint of unprofessional conduct from another HSGCA staff member.

D.R.56.1 ¶¶ 88-89, P.R.56.1 ¶¶ 88-89; Letter from Llermi Gonzalez to Midge Maroni, appended

as Ex. S to First Anci Decl.

　　　　In the end, it is not necessary to discuss whether the time between the complaints by Kott

and Maroni and their year-end ratings is short enough to allow for an inference of retaliation.  As

already discussed, see section III. B., plaintiffs have already admitted that (1) Kott received an

end of year U-rating for the 2011-2012 school year based on poor pedagogy; and (2) Maroni

received an end of year unsatisfactory rating for the 2011-2012 school year based on poor

pedagogy.  D.R.56.1 ¶¶ 68, 72.  Thus Kott and Maroni's retaliation claims fail because these

admissions reflect both that an improper motive did not play a part in defendants' ratings, let

alone a "substantial part," Anemone, 629 F.3d at 114, and that the defendants would have given

the U-ratings regardless of Kott and Maroni's speech.

　　　　C.  Monell Claims

　　　　Because the plaintiffs failed to show a constitutional violation by the individual

defendants, there is no need to assess the plaintiffs' municipal liability theory under Monell v.

Dep't of Social Servs. of the City of New York, 436 U.S. 658 (1978).  See P. Opp at 28-32; see

Gashi v. Cty. of Westchester, 2007 WL 749684, at *9 (S.D.N.Y. Mar. 12, 2007) (citation

omitted) ("Where, as here, the municipal liability sought to be imposed is predicated solely upon

the challenged actions taken by the municipal[ity]'s officers, a finding that plaintiff's

38

constitutional rights were not violated by the officers is necessarily fatal to maintaining a Monell claim."); Segal v. City of N.Y., 459 F.3d 207, 219 (2d Cir. 2006) (where "district court properly found no underlying constitutional violation," it was not necessary to consider claims of municipal liability under Monell).

VI.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Docket # 61) should be granted.  Defendants' motion to dismiss as a sanction based on the conduct of plaintiffs and their counsel (Docket # 58) should be denied as moot.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: February 8, 2016

      New York, New York

                                        _____
                                        GABRIEL W. GORENSTEIN
                                        United States Magistrate Judge